# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| CHEVRON PRODUCTS COMPANY (a division of CHEVRON U.S.A. INC.) ; CHEVRON U.S.A. INC., <br><br> Plaintiffs, <br><br> v. <br><br> TRAFIGURA TRADING LLC, f/k/a Trafigura AG, <br><br> Defendant. | § § § § § § § § § § § § § <br><br> Civ. A. No. _____ |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Chevron Products Company (a division of Chevron U.S.A. Inc.) and Chevron U.S.A. Inc. (collectively, "Plaintiffs" or "Chevron") allege as follows:

### NATURE OF THE DISPUTE

1. Defendant Trafigura Trading LLC, formerly known as Trafigura AG, ("Trafigura"), failed to accept crude oil deliveries from Chevron and thereby breached the parties' agreement.

2. In 2013, Chevron and Trafigura entered into a Master Trade Agreement (the "Agreement") governing the parties' "contracts for the purchase and sale or exchange of crude oil." Ex. 1 at CHEV_000001.

3. One provision of the Agreement provides that, if a party failed to deliver its required volume of crude oil in a given month, the receiving party would be required to take delivery of the resulting shortfall (the "Imbalance Volumes") ". . . as soon thereafter as is reasonably practical." *Id.* at CHEV_000004.

4. In October 2018, faced with supply-chain delays, Chevron notified Trafigura that it would underdeliver that month and thereafter offered Imbalance Volumes to Trafigura pursuant to the Agreement. Trafigura refused to accept the Imbalance Volumes, breaching the Agreement's plain terms. Trafigura's actions forced Chevron to mitigate its losses by finding alternative buyers for the barrels of oil Trafigura wrongly refused to accept. Because the demand for crude oil declined during the relevant time period, Chevron was forced to sell the barrels for far less than the price at which Trafigura was contractually obligated to purchase them.

5. Accordingly, Chevron brings this lawsuit for breach of contract and seeks damages for the difference between what Trafigura was obligated to pay and the price at which Chevron was able to sell the crude oil in the market.

## PARTIES

6. Plaintiff Chevron U.S.A. Inc. is a Pennsylvania corporation with its principal place of business in San Ramon, California.

7. Chevron Products Company is an unincorporated division of Chevron U.S.A. Inc., a Pennsylvania corporation with its principal place of business in San Ramon, California. Citizenship for diversity purposes is the same for each entity: both Pennsylvania and California. While Chevron Products Company should be considered the proper plaintiff in this matter, out of an abundance of caution, both Chevron U.S.A. Inc. (the entity within which Chevron Products Company is an unincorporated division) and Chevron Products Company bring this action as Plaintiffs.

8. Defendant Trafigura Trading LLC, formerly known as Trafigura AG, is a Delaware limited liability company, with its principal place of business in Houston, Texas. The sole member of Trafigura Trading LLC is Trafigura U.S. Inc., a Delaware corporation, with its principal place

of business in Delaware.  Because a limited liability company is deemed a citizen of every state in which any member is a citizen, Defendant is a citizen of Delaware.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant resides in this district and a substantial part of the events giving rise to Plaintiffs' claims occurred here.  In addition, the Agreement governing this dispute expressly states that:

> THIS CONTRACT SHALL BE GOVERNED BY, CONSTRUED AND ENFORCED UNDER THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PRINCIPLES. **EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL COURT OF COMPETENT JURISDICTION SITUATED IN THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS**, OR, IF ANY FEDERAL COURT DECLINES TO EXERCISE OR DOES NOT HAVE JURISDICTION, IN ANY TEXAS STATE COURT IN THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS (WITHOUT RECOURSE TO ARBITRATION UNLESS BOTH PARTIES AGREE IN WRITING). **EACH PARTY HEREBY IRREVOCABLY WAIVES**, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, **ANY OBJECTION TO THE JURISDICTION OF ANY SUCH COURT OR TO VENUE THEREIN** OR ANY CLAIM OF INCONVENIENT FORUM OF SUCH COURT OR OF SOVEREIGN IMMUNITY.

Ex. 1 at CHEV_000004-05 (emphasis added).

## FACTUAL BACKGROUND

*Chevron and Trafigura executed the Master Trade Agreement to govern their domestic crude oil trading with each other.*

11. Chevron[1] engaged in domestic crude oil buy/sell trades with Trafigura. Pursuant to these buy/sell trades ("Domestic Crude Contracts"), the parties agreed to exchange domestic crude oil with each other at certain prices and barrel volumes.

12. Chevron and Trafigura's Agreement was made to set out the terms governing ". . . all Domestic Crude Contracts having a delivery date on or after May 24, 2013." *Id.* at CHEV_000001. The parties agreed to the Conoco General Provisions Domestic Crude Oil Agreement ("Conoco General Provisions") (*Id.* at CHEV_000008-10), subject to certain negotiated amendments as set forth in Exhibit A to the Agreement (*Id.* at CHEV_000003-07). An accurate copy of the Agreement is attached hereto as Exhibit 1.

13. As part of the Agreement, the parties agreed to specific terms governing their Exchange Balancing relationship. Those terms are contained in Section J of Exhibit A to the Agreement (titled "BUY/SELL AND EXCHANGE BALANCING"). It provides, in part, as follows:

> Each party shall be responsible for maintaining the volumes bought and sold or exchanged in balance on a month-to-month basis, as near as reasonably possible. If a party fails to deliver or take its required volume during any month ("Shortfall Month"), including a failure to deliver or take due to an event of Force Majeure, despite reasonable efforts to remain in balance, such volumes ("Imbalance Volumes") shall be delivered and taken as soon thereafter as is reasonably practical, and the term of this Agreement shall be extended for the sole purpose of balancing deliveries. The parties shall endeavor to cause the Imbalance Volumes confirmed by the 20th of the month to be delivered during the following calendar month, and the Imbalance Volumes confirmed after the 20th of the month to be delivered during the second following calendar month, except to the extent prevented by the continuation of the event of Force Majeure.

*Id.* at CHEV_000004 (emphasis added). Section J mandates that any Imbalance Volumes be corrected in subsequent months, stating that "[i]f a party fails to deliver or take its required volume

---

[1] Chevron Products Company (a division of Chevron U.S.A. Inc.) is the Chevron entity that contracted with and engaged in crude oil business with Trafigura.

4

during any month . . . , the Imbalance Volumes "*shall* be delivered and *taken* as soon thereafter as is reasonably practical." *Id.* (emphasis added).

14. Section J further provides the formula for determining the price of the Imbalance Volumes:

> For all imbalances other than in the case of an extended Force Majeure as noted immediately above, if the price specified in this Agreement is a fixed price, or a formula price which is based on fixed calendar dates (e.g., April 12, 2009 or April 12-19, 2009), the price of the Imbalance Volumes shall be equal to such price without regard to the month of actual delivery. However, if the price specified in the Agreement is a formula price not based on fixed calendar dates, that formula, based on prices for the month of actual delivery, will be used to calculate the price for the Imbalance Volumes, unless specified otherwise in the Special Provisions of this Agreement.

*Id.* (emphasis added).

15. Imbalance Volumes were not uncommon in these contractual exchanges of crude oil between Trafigura and Chevron, and the parties complied with Section J in addressing those imbalances. For example, in March 2018 Trafigura was short in its delivery of oil to Chevron. Chevron then accepted the subsequently delivered imbalance barrels, pursuant to Section J of the Agreement. In July 2018, Chevron underdelivered barrels to Trafigura, and Trafigura accepted the subsequently delivered imbalance barrels pursuant to its contractual obligation.

### *Chevron notified Trafigura of Imbalance Volumes in October 2018.*

16. In October 2018, Chevron was to deliver over 931,000 barrels of Louisiana Light Sweet ("LLS") crude oil to Trafigura. But due to delivery delays caused by Chevron's suppliers, Chevron was unable to supply approximately 841,041 of those barrels. As a result, Chevron and Trafigura had Imbalance Volumes for their October 2018 exchange in the amount of 841,041 barrels.

17. Chevron provided notice to Trafigura as it became aware of the impending possibility of Imbalance Volumes for October 2018, both by email and through the Intercontinental Exchange ("ICE") messaging platform commonly used by traders.

18. Despite undertaking reasonable efforts to remain in balance with Trafigura, Chevron was short on its deliveries of LLS oil to Trafigura in October 2018. Notably, Chevron had contracts for LLS oil in place with its suppliers sufficient to timely deliver the required volumes and remain in balance with Trafigura. Through no fault of Chevron, its suppliers could not make their deliveries. During the relevant time period, Chevron continued to communicate with its suppliers in an effort to cure the Imbalance Volumes as soon as reasonably practical. Chevron diligently worked with its suppliers to take possession of the LLS barrels to which it had already secured rights so that it could deliver those barrels to Trafigura in a timely manner. Once it became evident that timely delivery would not occur, Chevron worked with its suppliers to obtain the LLS barrels it needed to cure the Imbalance Volumes. Chevron also acquired some additional LLS barrels from third parties to help it mitigate the shortfall it experienced during this time frame because of suppliers' failure to timely deliver the LLS barrels.

19. On November 6, 2018, Trafigura sent Chevron a "Notice of Default" dated November 2, 2018, asserting that Chevron failed to comply with its obligations under the Agreement. Ex. 2 at CHEV_000011-14.

20. On November 12, 2018, Chevron responded to Trafigura's "Notice of Default," directing Trafigura to Section J and its provisions governing the process for curing imbalances. Ex. 3 at CHEV_000017.

### *Trafigura failed to honor its contractual obligation by refusing to accept timely delivery of the Imbalance Volumes from Chevron.*

21. The parties' email communications show that Chevron met its contractual obligations, but Trafigura did not. In Chevron's November 12, 2018 response to Trafigura's "Notice of Default," Chevron offered to deliver the Imbalance Volumes to Trafigura: "Please

6

confirm Trafigura's acceptance of the 841,041 barrels in December in order to balance the October buy/sell deals." *Id.*

22.     Yet on November 14, 2018, Trafigura declined to accept the Imbalance Volumes that Chevron offered and that Trafigura was contractually obligated to accept. Trafigura asserted in a conclusory email that Chevron had ". . . failed to take reasonable efforts to remain in balance." *Id.* at CHEV_000016. Trafigura thus refused to accept delivery of the 841,041 barrels. But under Section J of the Agreement, Trafigura was required to accept those barrels. By failing to do so, Trafigura materially breached the Agreement.

23.     Chevron reminded Trafigura of its contractual obligations again on December 3, 2018, explaining that Chevron was in compliance with its obligations with respect to the Imbalance Volumes, as Section J requires that the barrels be delivered as soon thereafter as is reasonably practicable. *Id.* at CHEV_000015-16. Chevron further noted that Trafigura's failure to accept the volumes ". . . is a breach of Trafigura's contractual obligations." *Id.*

24.     In the December 3 email, Chevron gave Trafigura an opportunity to "clarify [its] intentions with respect to accepting the imbalance volume in January 2019 or February 2019." *Id.* However, on December 12, 2018, Trafigura reiterated its position that: "Chevron [] failed to take reasonable efforts to remain in balance. The non-delivered volumes by Chevron are not considered 'Imbalance Volumes' in the terms of [the] agreement. Trafigura maintains its position established in its November 14, 2018 communication." *Id.* at CHEV_000015.

### *Chevron had to sell the Imbalance Volumes at a lower price than Trafigura was supposed to pay.*

25.     Because Trafigura refused to accept delivery of the Imbalance Volumes as required, Chevron ultimately sold the Imbalance Volumes to third parties at lower market prices than the prices at which Trafigura was required to purchase the oil under Section J of the Agreement. As

7

addressed above, under Section J the price of the Imbalance Volumes is determined in one of two ways, depending on the terms of the contract for delivery from which the Imbalance Volumes arose. If the price specified in the particular contract between Chevron and Trafigura was a ". . . fixed price, or a formula price which is based on fixed calendar dates," then the price for the Imbalance Volumes shall equal the contractual price, without regard to the month of delivery of the Imbalance Volumes. By contrast, if the price specified in the particular contract between Chevron and Trafigura "was a formula price not based on fixed calendar dates," then the price is to be based on that formula, based on prices during the month of actual delivery.

26. Here, both price methodologies would have been in play had Trafigura accepted its contractual obligation to acquire the Imbalance Volumes. This is because, although most of the Imbalance Volumes arose out of contracts for a fixed price per barrel, several were for formula prices that were not tied to calendar dates. Because Trafigura refused to accept any of the Imbalance Volumes, Chevron had no choice but to sell those barrels on the open market. And because the market value of a barrel of oil declined during the relevant time frame, Chevron sold the Imbalance Volumes for far less than it would have received had Trafigura honored its contractual commitment and acquired the Imbalance Volumes at the prices required by Section J of the Agreement. In sum, Trafigura's breach caused over $15 Million in actual monetary damages to Chevron for which Chevron is entitled to relief.

27. Chevron is also entitled to recover its attorneys' fees and costs incurred in pursuing this action pursuant to Sections 38.001 et seq. of the Texas Civil Practice and Remedies Code.

## CAUSES OF ACTION

### COUNT 1 – BREACH OF CONTRACT
*Master Trade Agreement*

28. Chevron realleges and incorporates the material facts alleged in the preceding paragraphs of this Complaint as if fully set forth herein.

29. The Master Trade Agreement constitutes a valid and enforceable contract between Chevron and Trafigura. Under that Agreement, Trafigura agreed to take balancing deliveries, which includes the Imbalance Volumes at issue here.

30. All material conditions precedent or other obligations Chevron had under the Master Trade Agreement were either met by Chevron or were excused or waived. Chevron undertook reasonable efforts to remain in balance with Trafigura during the time frame at issue in this litigation. And Chevron offered to deliver the Imbalance Volumes of 841,041 barrels of LLS as soon as was reasonably practical. Chevron endeavored to cause the Imbalance Volumes, which were confirmed by Chevron after October 20, to be delivered during the second following calendar month.

31. Trafigura materially breached the Master Trade Agreement by refusing to accept and pay for the Imbalance Volumes offered by Chevron.

32. Trafigura's material breach of the Master Trade Agreement proximately caused injury to Chevron, as Chevron was forced to mitigate its losses by finding other buyers in the marketplace for the Imbalance Volumes. Thus, Chevron is entitled to recover damages for the injuries proximately caused by Trafigura's material breach of the Master Trade Agreement. Chevron is also entitled to recover pre- and post-judgment interest at the maximum legal rate.

33. In addition, pursuant to Section 38.001 et seq. of the Texas Civil Practice and Remedies Code, Chevron is entitled to recover its reasonable and necessary attorneys' fees

incurred in prosecuting this action. Chevron made timely presentment of its claim, and otherwise satisfied all conditions precedent to the recovery of such fees.

## CONDITIONS PRECEDENT

34. Chevron realleges and incorporates the material facts alleged in the preceding paragraphs of this Complaint as if fully set forth herein.

35. Chevron fully performed its contractual obligations, and all conditions precedent to its claim for relief were performed, occurred, or were excused or waived.

## DAMAGES, ATTORNEYS' FEES, AND COSTS

36. Chevron realleges and incorporates the material facts alleged in the preceding paragraphs of this Complaint as if fully set forth herein.

37. Trafigura's breach of its contractual obligations required Chevron to employ the undersigned counsel to pursue this lawsuit. Pursuant to Section 38.001 et seq. of the Texas Civil Practice and Remedies Code, this claim was timely presented to Trafigura and it remains unpaid.

38. Chevron seeks its costs and reasonable attorneys' fees under Texas Civil Practice & Remedies Code § 38.001(b)(8).

## CONCLUSION AND PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request that Defendant Trafigura Trading LLC be cited to appear and answer, and that following a trial or final hearing, the Court:

(a) Enter a final judgment against Trafigura;

(b) Order Trafigura to pay all damages established by Chevron in this matter to Chevron with pre- and post-judgment interest on all amounts owed at the maximum allowable rate;

(c)     Order Trafigura to pay all past and future attorneys' fees and recoverable costs, including taxable costs of court to Chevron; and

(d)     Award Chevron all additional relief, at law or in equity, to which Chevron shows itself to be justly entitled.

Dated: October 27, 2022					Respectfully submitted,

**BECK REDDEN, LLP**

By:  __/s/ *Fields Alexander*____
    Fields Alexander
    State Bar No. 00783528
    S.D. Texas No. 16427
    falexander@beckredden.com
    Seepan V. Parseghian
    State Bar No. 24099767
    S.D. Texas No. 2953872
    sparseghian@beckredden.com
    Madison Young
    State Bar No. 24121281
    S.D. Texas No. 3735149
    myoung@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Telephone:  (713) 951-3700
Facsimile:  (713) 951-3720
**ATTORNEYS FOR PLAINTIFFS CHEVRON PRODUCTS COMPANY (a division of CHEVRON U.S.A. INC.) AND CHEVRON U.S.A. INC.**